**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MARY J. YONCE,**

                **Plaintiff,**

**-vs-**                                        **Case No. 6:05-CV-1416-ORL-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

                **Defendant.**
_____

**ORDER**

This cause came on for consideration without oral argument on the Complaint filed by Mary J. Yonce, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. No. 7, 8.  Pursuant to the consent of the parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c).  Doc. Nos. 11, 12.[1]

_____

[1] On May 25, 2006, this case was dismissed for failure of prosecution.  Doc. No. 16.  The case was later reopened based on a motion made by substitute counsel for Yonce.  Doc. Nos. 21, 25.  Thereafter, the parties filed their respective memoranda of law.  Doc. Nos. 30, 31.

I.    **PROCEDURAL  HISTORY.**

In October 2003, Yonce applied for disability benefits under the Federal Old Age,

Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*.

(sometimes referred to herein as the Act).  She alleged that she became disabled on

April 29, 1994.  R. 68-69. Yonce's application was denied initially and on reconsideration.

R.  27-40.

Yonce requested a hearing before an administrative law judge (ALJ).  R. 41, 44.

An ALJ held a hearing on February 1, 2005.  Yonce, represented by an attorney, testified

at the hearing.  Henry Yonce, Yonce's husband, and Charles Heartsill, a vocational

expert (VE), also testified.  R. 223-52.

After considering the testimony and the medical evidence presented, the ALJ

determined that Yonce was insured under OASDI through June 30, 2001.  R. 12.  The

ALJ found that Yonce had not engaged in substantial gainful activity since the alleged

onset date of her disability. R. 24.

The ALJ concluded that the medical evidence showed that Yonce had multiple

sclerosis, which was a severe impairment.  This impairment did not meet or equal any of

the impairments listed in the applicable social security regulations (the Listings).[2]  R. 17.

---

[2]  The Code of Federal Regulations "contains a Listing of Impairments specifying
almost every sort of medical problem ('impairment') from which a person can suffer,
sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d
1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

The ALJ did not doubt that Yonce was disabled as of the date of the decision.  R. 22 n.1.  He found, however, that "the medical evidence simply does not support significant physical limitations from her alleged onset date to June 2001."  *Id.*

The ALJ concluded that Yonce had the residual functional capacity (RFC) to do the following:

> stand for 2 hours of an 8 hour day, with a maximum of 30 minutes at one time; sit for 6 hours of an 8 hour day, with a maximum of 30 minutes at one time; walk for 2 hours of an 8 hour day, with a maximum distance of 1 block at a time; frequently lift 10 pounds; occasionally lift 20 pounds; occasionally push/pull with her upper and lower extremities, climb stairs/ramps, balance, kneel, stoop, crouch, and crawl; never climb ladders, scaffolds or ropes; and avoid frequent exposure to hazards.  She would require a sit/stand option every 30 minutes.  She would also require detailed, but not complex, work.

R. 21.  The ALJ concluded that this RFC permitted Yonce to perform a significant range of light work.  R. 23.

In reaching this conclusion, the ALJ gave less than controlling weight to the opinions of two of Yonce's treating doctors, Dr. Dinkla and Dr. Shuster, because the ALJ found the opinions not supported by the medical records.  R. 20.  Instead, the ALJ gave significant weight to the opinions of physicians who had reviewed the medical records but never examined Yonce.  R. 21.  The ALJ considered Yonce's subjective complaints of "dizziness, problems with her balance, and weakness in her extremities" by giving her a sit/stand option.  R. 21-22.  The ALJ acknowledged Yonce's fatigue when she walked and her impaired motor coordination in her upper extremities, but did not explain how these limitations were addressed in the RFC assessment.  R. 22.

The ALJ also found that Yonce was overstating the limitations arising from her impairments before the date last insured.  The ALJ based that conclusion on Yonce's activities of daily living, her travel out-of-state, and her ability to work albeit not at a level constituting substantial gainful activity.  The ALJ also noted that Yonce's failure to stop smoking despite her doctors' advice to do so "lessens her credibility to the extent that it suggests that she may have engaged in behavior which was not beneficial to her medical condition."  R. 18.  The ALJ also observed that the record reflected that medication had been relatively effective in controlling Yonce's symptoms, there were no significant clinical or laboratory abnormalities consistent with disabling multiple sclerosis, and there were long periods when Yonce did not seek treatment.  R. 18-19, 22.

The ALJ found that Yonce's past relevant work required the ability to perform in excess of her RFC.  22.  Relying on the testimony of the VE, and considering the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ concluded that Yonce could perform specific unskilled jobs identified by the VE that required a light level of exertion and that were available in the national economy.  R. 23, 25.  Therefore, the ALJ concluded that Yonce was not disabled.  R. 24.

Yonce requested review of the ALJ's decision. R. 7.  On July 21, 2005, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 4-6. Yonce timely sought review of this decision by this Court.  Doc. No. 1.

## II.     JURISDICTION.

Plaintiff having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

## III.    STATEMENT OF FACTS.

The facts of record are adequately stated in the ALJ's decision and in the parties' memoranda.  Accordingly, I will only summarize the pertinent facts to protect Yonce's privacy to the extent possible.

On the date last insured, Yonce was 53 years old.  R. 68, 228.  She had a high school education and training as a dental assistant.  R. 229.

Yonce worked as a dental assistant.  Problems began when she started dropping instruments and had difficulty concentrating.  R. 233, 243.  She worked part-time in 1997 and 1998, but she could not handle the physical demands of the work.  R. 231-35.

John R. McCormick, M.D., and Hendrik Dinkla, M.D., treated Yonce since at least 1988.  *See* R. 151.  They determined that she had multiple sclerosis and optic neuritis (INO).  R. 151, 178.  "Multiple Sclerosis is a progressive central nervous system disorder that results in multiple neurological problems including trouble walking, fatigue and sensory loss."  R. 189.  Optic neuritis is often due to multiple sclerosis (MS), and results in rapid loss of vision and pain on moving the eye.  It is subject to spontaneous remission and relapse, each relapse increasing the residual damage.  Doc. No. 30 at 4 n.2 (citing *The Merck Manual* 739 (17th ed. 1999)).  She also had degenerative lumbar spine disease.  R. 169, 177.

From 1994 through 1996, Yonce complained of back pain with shock-like sensations radiating from her neck, leg cramps, headaches, neck pain, blurred vision,

unsteady balance, dizziness, leg weakness and numbness, ear tinnitus, severe fatigue and difficulty swallowing.  R.  161, 163, 166-68, 172-78.  In early 1995, Yonce reported dizziness, visual changes and inability to focus when fatigued, and poor balance with some falling.  R. 171.  On March 14, 1995, Dr. McCormick wrote that Yonce developed fatigue from MS and had back pain associated with lumbar spine degenerative disease. She had impaired fine motor coordination in her upper extremities which interfered with her ability to handle small objects.  He opined that she could not sit or stand for longer than 30 to 40 minutes, and that she could not walk more than 1 block at a time.  R. 169.

An MRI performed in September 1996, as compared with a study performed in 1987, showed significant progression of the MS.  R. 162.

In early 1997, Yonce reported that she was doing well with the use of Avonex.  R. 151, 56-60.  Nevertheless, she reported an episode of blurry vision in April and October, and that she had fallen in August.  R. 154-55, 158.  In December 1997, Yonce reported experiencing severe vertigo when looking up while putting up Christmas decorations.  R. 153.

On May 7, 1998, Dr. McCormick noted that Yonce had some pallor in the left optic disc.  She was fatigued.  R. 151.  In July 1998, Yonce reported another bout with vertigo.  Dr. Dinkla noted that there had been no improvement in the optic neuritis in Yonce's left eye.  R. 150.

As of January 1999, Yonce reported that she continued to lose her balance from time to time, and continued to have transient numbness in her legs.  She had a problem with her left eye, but her acuity was good.  She wanted to stop smoking, and Dr. Dinkla prescribed medication to help her do that.  R. 149.  Beginning in June and continuing

through early 2000, Yonce complained of headaches.  R. 146-48. She continued to lose her balance occasionally.  R. 146.  As of February 16, 2000, she had not smoked in five days.  R. 146.

On October 25, 2000, Yonce reported more problems with balance and increased fatigue.  Dr. Dinkla found no evidence of progression of her MS.  R. 145.  On April 18, 2001, Yonce again reported balancing problems, with unsteadiness when she leaned over.  Dr. Dinkla observed a loss of sensation in Yonce's leg.  He encouraged her to stop smoking.  R. 144.  The discomfort in her right leg resolved as of July 2001, but by that time she was again having vision problems.  Dr. McCormick noted that the vision problems were associated with her MS and prescribed Prednisone.  R. 143.

Yonce's testimony about her condition before June 30, 2001, is consistent with the medical records.  She and her husband averred that during this time she was extremely fatigued every day, had headaches and difficulty concentrating.  R. 230, 234-35, 243.  Her balance was bad and she had a hard time standing.  R. 244.  She also had difficulty buttoning buttons.  R. 245.  She could cook and load a dishwasher. She could occasionally do laundry and fold clothes while sitting down.  She did not clean or do other household chores.  R. 236-37, 240.  Her husband helped with these chores.  R. 240-41, 244-45.  She was able to drive.  She traveled with her family to North and South Carolina.  R. 237.  She went to church three times a week, and sometimes went to movies in the afternoon or to a restaurant with her husband.  R. 238-39.   Mr. Yonce noted that Yonce's condition had progressively worsened over time.  R. 245.

Donald Warren Morford, M.D., prepared an RFC assessment based on review of the medical records in Yonce's file as of November 18, 2003.  He opined that Yonce

could lift up to 20 pounds occasionally and 10 pounds frequently.  She could sit, stand or walk about 6 hours in an 8-hour workday.  She could only occasionally perform postural activities.  She must avoid concentrated exposure to extreme cold and heat and hazards. R. 125-32.

Eric C. Puestow, M.D., also prepare an RFC assessment based on review of the medical records in Yonce's file as of December 22, 2003.  He concurred with Dr. Morford's assessment, except that he concluded that Yonce would not have to avoid exposure to extreme cold and heat. R. 133-40.

After the reviewing physicians rendered their opinions, additional medical evidence was included in the file from the Mayo Clinic regarding treatment of Yonce by Elizabeth A. Shuster, M.D.  R. 180-221.  Dr. Shuster first examined Yonce on December 30, 2003.  Yonce indicated that she had felt increasingly fatigued as of November 2003 and had a burning sensation in her right leg that caused her to lose her balance.  She noted that she had switched from Avonex to Rebuff in February 2003.  She was still smoking.  R. 208-09.

After further testing, Dr. Shuster determined that Yonce had both MS and an inherited muscle disease, vacuolar myopathy,[3] "that results in weakness and atrophy of the muscles and . . . is also progressive."  R. 181, 189.  Dr. Shuster opined that with "these two significant neurologic disorders, it is unlikely that Mrs. Yonce will be able to obtain gainful employment, as she would not likely be able to meet the physical demands of full-time employment."  R. 189; *see also* R. 181.

---

[3] Dr. Shuster first concluded that Yonce had muscular dystrophy, *see, e.g.,* R. 141, but it appears that this diagnosis was changed to vacuolar myopathy after further testing.

On February 6, 2004, Dr. Dinkla wrote as follows: "Mary Yonce has a long history of multiple sclerosis with severe fatigue, moderate spasticity.  She also had an inflammatory myopathy.  She has been disabled since June 2001."  R. 142.

Based on the testimony at the hearing and the medical records, the ALJ asked the VE to assume a hypothetical individual as follows:

> [T]he same age as the claimant with the same educational background and past work experience.  Further assume this hypothetical retains the capability of lifting 20 pounds on an occasional basis, 10 pounds on a frequent basis, can stand 2 of 8 hours.  That would be limited to 30 minutes at a time. Walking would be 2 of 8 hours.  That likewise would be limited to walking 1 block, nor more than 1 block at a time. Sitting would be 6 of 8 hours.  That, again, would be limited to 30 minutes at a time.  Obviously this hypothetical individual would need a sit/stand option based on that.  Pushing and pulling in the upper and lower extremities would be occasional.  Ropes, ladders, scaffolds would be never. Climbing occasional.  Balancing, stooping, kneeling, crouching and crawling would be occasional.  Hazards would be avoid concentrated exposure.  This individual could do detailed, but no complex work.

R. 247-48.

The VE opined that this individual could not perform any of Yonce's past relevant work.  R.  248.  The VE indicated that this individual could perform jobs available in the national economy, specifically information clerk (sedentary, SVP 4), parking lot attendant (light, SVP 2), ticket seller (light, SVP 2), and mail sorting (light, SVP 2).  R. 248-49.

The VE then asked the ALJ to assume that the hypothetical individual had the additional limitation of fatigue that would cause the individual to miss one to four hours of work one or more times a week.  The VE opined that this individual would not be able to work.  R. 249.

## IV.   STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A.  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4).  An affirmative answer to any of the above questions leads

to either the next question, or, on steps three and five, to a finding of disability.  A

negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800

F.2d 1026, 1030 (11th Cir. 1987).

"The burden is primarily on the claimant to prove that he is disabled, and therefore

entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274,

1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden

temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence

that there is other work available in significant numbers in the national economy that the

claimant has the capacity to perform."  *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d

1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether

the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395

F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal

standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42

U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla,

and must do more than create a suspicion of the existence of the fact to be established.

It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir.

1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence

favorable as well as unfavorable to the [SSA's] decision."  *Chester v. Bowen*, 792 F.2d

129, 131 (11th Cir. 1986).  Where the SSA's decision is supported by substantial

evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## V.     ANALYSIS.

Because the ALJ recognized that Yonce was disabled at the time of the hearing, Yonce asserts that he should have obtained assistance from a medical expert to determine the onset date of the disability as required by Social Security Ruling 83-20. She contends, as well, that the ALJ erred in finding her testimony to be not entirely credible, because her subjective symptoms were consistent with her neurological disorders. The Commissioner argues that a medical expert is not required when, as here, the record was not inadequate or ambiguous, and that substantial evidence supported the ALJ's credibility determination.

-12-

Ruling 83-20 addresses the determination of the disability onset date of slowly progressive impairments.  It provides as follows:

> The medical evidence serves as the primary element in the onset determination. Reports from all medical sources (e.g., physicians, hospitals, and government agencies) which bear upon the onset date should be obtained to assist in determining when the impairment(s) became disabling.
>
> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process. . . .
>
> How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

Soc. Sec. R. 83-20, 1983 WL 31249 at 2-3.

It is undisputed that Yonce had two neurological disorders that result in slowly progressive impairments.  Unlike other cases in which an ALJ found that a claimant was not disabled as of the date of the hearing, in this case the ALJ expressed no doubt that Yonce was disabled.  Therefore, it was incumbent upon him to determine the alleged onset date of the disability.

The ALJ placed great reliance on the opinions of the reviewing physicians to determine that Yonce was not disabled before June 30, 2001.  However, as noted above, these reviewing physicians did not have the benefit of Dr. Shuster's records,

which showed that Yonce had an *inherited* neurological condition, vacuolar myopathy, that had not been diagnosed by Drs. McCormick and Dinkla.  This additional neurological condition provided further support for Yonce's complaints of leg weakness and related problems within the insured period. They also did not have the opinion of Dr. Dinkla, one of Yonce's treating physicians for many years, that the impairments arising from her combined neurological conditions precluded her from performing substantial gainful activity as of June 2001.  Thus, their opinions, based on an incomplete medical record, are not sufficient to support an inference of the disability onset date.

Furthermore, the record is inadequate because the ALJ rejected the opinion of Dr. Dinkla about the onset date of Yonce's disability, which was the only medical opinion regarding the onset date.  Under Ruling 83-20, therefore, it was incumbent on the ALJ to seek the assistance of another medical expert, such as Dr. Shuster, to render an opinion regarding the onset date of Yonce's disability.    Having failed to do so, the ALJ erred as a matter of law by disregarding the requirements of Ruling 83-20.

Yonce asserts that remand for further proceedings is not appropriate because the ALJ's RFC determination is consistent with sedentary, rather than light work.  As such, the Grids would have directed a determination that she was disabled.

While Yonce is correct that the limitations on her ability to stand and walk are consistent with sedentary work, her ability to lift and carry is consistent with light work. Social Security Ruling 83-10 provides that when an RFC is between two exertional levels, and the Grids would direct a finding of not disabled at one level and disabled at another level, the ALJ should consult a vocational expert to determine whether there are jobs that the claimant can perform.  Soc. Sec. R. 83-10, 1983 WL 31251 at *2.  Because

the ALJ relied on the testimony of the VE, who opined that there were jobs that an individual with Yonce's RFC could perform, remand for an award of benefits is not appropriate.  However, on remand the Commissioner should reassess Yonce's RFC based on the evidence as a whole and reassess her ability to work with the assistance of a VE.

## VI.    CONCLUSION.

For the reasons stated herein, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and that the case is **REMANDED** for further proceedings. I direct the Clerk of Court to enter judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** this 4th day of February, 2008.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE